THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BARBARA ANN DAVIS, Defendant-Appellant.

(No. 61120;

First District (3rd Division)—October 16, 1975.

James J. Doherty, Public Defender, of Chicago (Gail A. Moreland and Richard D. Kharas, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, John T. Theis, and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Defendant, Barbara Ann Davis, was charged with the murder of Marvin Adams. After a bench trial, she was found guilty of voluntary manslaughter and sentenced to a term of 3 to 9 years. On appeal, defendant contends that she was not proved guilty beyond a reasonable doubt; that a new trial should have been granted on the ground of newly discovered evidence; and that the sentence was excessive.

Defendant had been living with the decedent and had three children by him. The shooting occurred on July 22, 1972, in a gangway south of the premises at 7224 South Emerald in Chicago.

Herman L. Adams (hereinafter Herman) testified for the State that the decedent, 32 years of age, was his brother. On the afternoon in question, Herman was seated in the front part of an auto repair garage at the back of the premises at 7233 South Halsted Street. The garage was located on the west side of the alley between Halsted and Emerald. Defendant entered the garage at about 3:30 or 4 p.m. The decedent, Jewell Williams, Walter Gadison, and Thomas Sanders also were present. The decedent received a telephone call in the garage, and defendant snatched the telephone and shoved the decedent. The decedent shoved defendant back, and she lost her balance. She fell over a stove and dirtied her clothes. Williams then escorted her home.

Herman further testified that defendant later returned. She was on the east side of the alley with her hands behind her back. She called to the decedent to come out of the garage. Defendant raised her hand and Herman saw that she had a gun. She disregarded Herman's admonition to put the gun away. The decedent walked to the door of the garage, and defendant told him to come with her. Defendant started toward the gangway and the decedent followed her. Defendant and the decedent were about 15 feet apart and defendant had the gun in her hand. After they entered the gangway, Herman could not see them. Herman heard two shots and ran to the gangway entrance. The decedent was on his knees, and had been shot in the chest. Herman did not see defendant after the shooting.

Jewell Williams corroborated Herman's testimony. Williams further testified that when he returned to the garage after escorting defendant home, he warned the decedent that defendant said "she has got something for you." Williams testified that Sanders told the decedent that he better leave because defendant had a gun. Williams heard the defendant, using profanity, call to the decedent. While Williams was trying to get some children out of the alley because defendant had a gun, he saw defendant enter the gangway with the decedent following. Williams lost sight of them. He heard a shot, took two or three steps towards the

gangway, and heard a second shot. When Williams entered the gangway, Herman was already beside the decedent. Defendant was gone.

Thomas Sanders, a cousin, testified for defendant. He was present on the afternoon in question and noticed decedent with a bottle of gin in his hand. The decedent appeared to be under the influence of alcohol. Sanders denied that he ever told anyone defendant had a gun. When defendant asked to speak to the decedent, she did not use profane language. Sanders heard Herman advise decedent to beat up the defendant. As decedent left the garage, he told defendant that he was going to beat her. Sanders heard a shot fired and saw defendant with a gun. She went back to the gate of the gangway and the deceased rushed after her. Sanders further testified that when defendant fired the first shot, the gun was pointed in the air. Defendant then placed the gun in her purse. Decedent did not have a gun.

Robin Davis, daughter of defendant and the decedent, testified for defendant. She was 12 years old. About three weeks before the shooting, decedent, while drunk, forced her brother and her to fire shots into the wall at their house.

Michael Wilson, 14 years old at the time of the incident and a cousin of defendant's, testified that he lived with his mother at 7224 South Emerald. On the day of the shooting, defendant arrived at his house in a cab. She asked him to go around to the back with her. Defendant did not enter the alley, but stood at the gate and called the decedent twice. When the decedent came out of the garage, defendant started walking toward him. She took a gun out of her purse and fired a shot in the air. When the shot was fired, decedent paused for a few seconds. Defendant turned around and went back towards the house. The decedent followed her, running fast. Wilson called out a warning to defendant, and heard the decedent say he was going to kill her. Decedent grabbed defendant by the hair, but it was a wig and fell off. The decedent again stated that he was going to kill her, and grabbed her by the collar. Defendant took the gun out of her purse, shot the decedent, and placed the gun back in her purse. The decedent fell and defendant ran to the front of the house.

Defendant testified that she was 27 years of age, and was living with the decedent at the time of the shooting. She had six children, three of them by the decedent.

On the morning in question, the decedent left for work. However his employer would not let him work because he had been drinking. He left the home later with a relative. Defendant left home early in the afternoon and took decedent's gun because when he drank he made the children shoot in the wall or he shot the gun himself. Defendant went

to her aunt's house which was across the alley from the repair garage. Defendant went over to talk to the decedent. At the time Williams was talking to someone on the telephone and summoned the decedent. Defendant said she knew Williams was talking to a lady, so she was going back to-her aunt's home to avoid embarrassment. Decedent grabbed her by the arm and stated that he would talk to anyone he wanted. He hung up the telephone and pushed defendant into a heater. The heater fell on her, and her clothes were soiled. The decedent swung at her with a bottle and she hid behind Williams. She asked Williams to take her home, and the decedent warned that Williams was not to be there when he came home.

Williams took her home and said that he would be back in fifteen minutes to pick her up. When he did not return, she took a cab back to her aunt's home. She asked Wilson, her cousin, to accompany her around the back so that she could talk to the decedent. She called the decedent twice, and heard someone in the garage advise the decedent to go out and beat her. Decedent ran out of the garage in an angry manner, so she stepped back and fired the gun in the air. Decedent stopped, and they both stood still for a few moments. Defendant then placed the gun in her purse and turned to return to her aunt's house. When she had traveled part way, her cousin shouted a warning. Defendant looked around just as the decedent snatched her wig and stated that he was going to kill her. He pulled her by the neck and repeated the threat. She took the gun out of her purse and fired. She ran into her aunt's house.

On cross-examination, defendant said she had fought with decedent on prior occasions. He had never threatened to kill her before. She later threw the gun into a garbage can located in a different neighborhood. When she fired the second shot she was frightened but not angry at the decedent.

Defendant initially contends that she was acting reasonably when she shot decedent; that, in effect, she used reasonable force which she reasonably believed was necessary to save herself from imminent death or bodily harm. The People maintain that the proof showed beyond a reasonable doubt that defendant's belief regarding necessity for use of force was unreasonable so that she was properly found guilty of voluntary manslaughter.

Section 9—2(b) of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 9—2(b)) defines voluntary manslaughter as follows:

> "A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would

justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable."

Section 7—1 of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 7—1) states:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. *However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another*, or the commission of a forcible felony." (Emphasis added.)

Under section 7—1 it is only where defendant is acting under a reasonable belief of danger of imminent death or great bodily harm that use of deadly force is justifiable.

■■ A person commits the offense of voluntary manslaughter when he kills another without lawful justification while acting under a sudden and intense passion resulting from serious provocation by the individual killed. "Serious provocation" is defined by the Criminal Code as "conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat. 1971, ch. 38, par. 9—2(a).) A person is guilty of voluntary manslaughter, if, in taking another's life, he believes that he is in danger of losing his own life or suffering great bodily harm but his belief is unreasonable.

The issue of self-defense is one of fact. (*People v. Jordan* (1960), 18 Ill.2d 489, 165 N.E.2d 296.) It is the function of the trial judge, sitting as the trier of fact, to resolve conflicts in the evidence and to determine the credibility of witnesses. (*People v. Pelegri* (1968), 39 Ill.2d 568, 237 N.E.2d 453.) A reviewing court will not disturb the trial court's findings unless the evidence is so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt of defendant's guilt. *People v. Adams* (1969), 113 Ill.App.2d 205, 252 N.E.2d 35.

■■ Even if defendant's testimony at trial is accepted, defendant's shooting of the decedent was not justified. After defendant had engaged in an altercation with the decedent at the garage, she returned to her home. She changed her clothes and took a taxi cab back to her aunt's nearby home. She requested her 14-year-old cousin to go around to the back with her so that she could talk to the decedent. They went back through the gangway to the gate and she called to the decedent. He did not answer and she called again and asked to talk to him. She heard someone in the garage suggest to the decedent that he go out and beat

her. Decedent then ran out of the garage in an angry manner. She stepped back, took the gun out of her purse and fired in the air. She placed the gun back in her purse and started through the gangway toward her aunt's home. Defendant further stated that when she was part way through the gangway, her cousin called out in warning. She turned and at that time the decedent was snatching her wig off her head stating that he was going to kill her. Decedent grabbed defendant's collar and again said he was going to kill her. Defendant took the gun out of her purse and fired. A belief that the decedent, unarmed, might kill or greatly injure the defendant, while she had a loaded gun, was unreasonable. In view of all the circumstances, it was not error for the trial court to find that defendant did not act in self-defense and was guilty of voluntary manslaughter beyond a reasonable doubt.

Defendant next contends that the trial court committed error in denying her petition for a new trial on the basis of newly discovered evidence. Attached to defendant's petition were the affidavit and supplementary affidavit of Walter Gadison. The affidavits recited that defendant did not have the gun in her hand when she called out to the decedent just before the shooting; that thereafter defendant took the gun out of her purse; that Gadison heard two shots fired, one of which was fired in the alley by defendant and the other shot he heard came from the gangway where decedent's body was found; that Williams and Herman were inside the garage and neither of them could see the defendant at the time of the first shot; and that when the second shot was fired they remained inside the garage and were unable to see the occurrence.

Also attached to defendant's petition for a new trial was the affidavit of Barbara Hudson. She stated that she saw defendant turn into the gangway followed by the decedent; that when defendant was about halfway down the gangway, the decedent entered the gangway and started to run after defendant; that decedent was "right up on her" when the affiant heard the shot, which was fired in the gangway.

■■ Application for a new trial on the ground of newly discovered evidence is looked upon with disfavor and subject to the closest scrutiny by the court. (*People v. Holtzman* (1953), 1 Ill.2d 562, 116 N.E.2d 338.) To warrant a new trial, the new evidence must be of such conclusive character that it will probably change the result on retrial. It must be material to the issue, not merely cumulative, and it must have been discovered since the trial, and be of such character that it could not have been discovered prior to the trial by the exercise of due diligence. (*People v. Baker* (1959), 16 Ill.2d 364, 158 N.E.2d 1; *People v. Drake* (1974), 20 Ill.App.3d 762, 314 N.E.2d 532.) As to the testimony of Gadison, it cannot be said that on the exercise of due diligence the whereabouts of Gadison could not have been discovered prior to trial. Although the

State's answer to defendant's discovery motion is not in the record, the trial court stated that Gadison's name was given to defendant in February, 1973, in the answer to defendant's discovery motion. The trial court also stated that "the mere fact that Gadison had moved since the date of the police report is not sufficient to excuse the failure to locate him in time for trial." The judge concluded that there was not an exercise of due diligence in this respect. Moreover, Gadison's affidavit and supplemental affidavit were merely cumulative of other testimony and did not contradict the testimony of Williams or Herman that they did not see what occurred in the gangway after the parties went out of their view.

In regard to Barbara Hudson's affidavit, the trial court said "it will be assumed that this testimony could not have been discovered in time for trial" and, therefore, it must be determined "whether the newly discovered evidence is sufficiently conclusive to present at least the likelihood of a different result if a new trial is granted." The trial judge concluded that the testimony of Mrs. Hudson was merely cumulative and would not alter the result upon retrial. We agree with that determination.

Mrs. Hudson swore that she saw the decedent chase after defendant in the gangway, and come right up to her. She further stated that she then heard a shot fired. She also stated that she had heard another shot fired shortly before in the alley. This recitation could not be considered conclusive enough to change the result of the original trial. The trial court did not abuse its discretion or commit error in denying the motion for a new trial based on the finding of newly discovered evidence.

■■ Defendant's final contention is that the sentence imposed was excessive. She points out that she is 27 years of age, and had no prior criminal record. She also notes that she is the mother of six children, all of tender age who need her care and supervision.

While this court has the authority to reduce sentences, the Supreme Court has indicated that the authority should be exercised with a great deal of caution and circumspection. (*People v. Fox* (1971), 48 Ill.2d 239, 269 N.E.2d 720.) The imposition of a sentence is within the discretion of the trial court and courts of review will not interfere with that discretion unless it is manifested that the sentence is excessive. (*People v. Kendricks* (1972), 4 Ill.App.3d 1029, 283 N.E.2d 273.) Considering the nature of the offense and the facts presented in the present case, the sentence imposed was not excessive.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McGLOON, P. J., and DEMPSEY, J., concur.